IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

PAULA KAY WHITE     PLAINTIFF

VS.     CIVIL NO. 05-5100

JO ANNE B. BARNHART, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION     DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Paula White, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying her claim for disability insurance benefits (hereinafter "DIB") under the provisions of Title II of the Social Security Act (hereinafter the "Act").

**Procedural Background:**

The application for DIB now before this court was filed on December 16, 2003, alleging an onset date of November 7, 2002, due to degenerative disc disease with chronic pain, hypertension, and status post hemilaminotomy and microdiscectomy at the L5-S1 level. (Tr. 11, 43-45, 62). An administrative hearing was held on October 13, 2004. (Tr. 258-274). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was forty-five years old and possessed a high school education. (Tr. 263). Records indicate that plaintiff has past relevant work experience ("PRW") as a housekeeper in a hospital, certified nurse's assistant ("CNA"), and cashier. (Tr. 63, 263-264).

On February 23, 2005, the Administrative Law Judge (hereinafter "ALJ") issued a written decision finding that plaintiff suffered from severe impairments, but that those impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No.

4. (Tr. 17). After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ("RFC"), to perform a full range of sedentary work on a sustained basis. He then found that plaintiff's RFC did preclude her from performing her past PRW, but utilizing the Medical Vocational Guidelines (the "Grids") concluded that she was not disabled. (Tr. 16, 17).

On May 18, 2005, the Appeals Council declined to review this decision. (Tr. 2-4). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. # 5, 6).

**Evidence Presented:**

On November 4, 2002, plaintiff injured her lower back at her job, while helping a janitor move an exam table. (Tr. 51). On November 8, 2002, plaintiff presented to Northwest Medical Center complaining of lower back pain and numbness in her right hand. (Tr. 147). An examination revealed no evidence of nerve impingement. Accordingly, plaintiff was prescribed ice/heat, bed rest for two days, Vicodin, and Flexeril. (Tr. 151-152, 239). She returned to the emergency room ("ER") on November 10, 2002, with continued complaints of back pain. (Tr. 240). Again, there was no evidence of nerve impingement. Therefore, she was treated via ice/heat, Skelaxin, Anaprox, and Vicodin. (Tr. 240).

On November 26, 2002, magnetic resonance imaging ("MRI") of plaintiff's lumbar spine showed disc space narrowing and desiccation at L5-S1 and a disc herniation on the right that impinged upon the right S1 nerve root and adjacent theca. (Tr. 145). There was minimal annular bulging to the left which did not appear to involve neural elements. (Tr. 144). On December 12,

2002, Dr. Stepanka Baggett, a treating physician, noted that plaintiff experienced pain in her legs as well as her back. (Tr. 141). She indicated that it hurt to sit. Plaintiff was diagnosed with lumbar strain, degenerative disc disease, and a pinched nerve. Dr. Baggett prescribed Naprosyn, Skelaxin, and Vicodin. (Tr. 141).

On December 23, 2002, plaintiff sought emergency treatment for her lower back pain after running out of pain medication. (Tr. 139). Then, in January 2003, Dr. Vincent Runnels referred plaintiff to Dr. Luke Knox for a second opinion regarding possible decompression surgery. (Tr. 169). Her medications were noted to include Wellbutrin, Celebrex, Hydrocodone, and Ambien. He also prescribed posture correction and back exercises. (Tr. 169).

On February 20, 2003, Dr. Luke Knox treated plaintiff for back pain and right leg pain. (Tr. 136). She rated the pain as a six on a scale of one to ten, stating that it was continuous. Dr. Knox ordered a repeat lumbar MRI. (Tr. 136). The MRI revealed degenerative disc disease at the L5-S1 level and disc herniation with a free fragment that had migrated interiorly, compromising the right S1 nerve root. (Tr. 192).

On February 27, 2003, Dr. Knox noted that plaintiff described a characteristic S1 radiculopathy with a significant element of left leg symptoms. (Tr. 167). She had an absent ankle reflex on the right with significant atrophy over the right calf. There was also a markedly positive straight leg raising test. (Tr. 167). On March 12, 2003, an x-ray of her lumbar spine showed degenerative disc changes at L5-S1 with diminished intervertebral distance and radiolucent appearance of the disc. (Tr. 131, 193). There was also evidence of osteopenia. (Tr. 131, 193). On March 14, 2003, plaintiff underwent a hemilaminotomy and microdiscectomy. (Tr. 124-127).

On April 7, 2003, plaintiff's staples were removed. (Tr. 164). Then, on April 28, 2003, a postsurgical x-ray of plaintiff's lumbar spine showed degenerative disc disease at L5-S1. (Tr. 120).

On April 29, 2003, plaintiff denied leg pain but reported significant lumbago. (Tr. 163). As such, Dr. Knox instituted a physical therapy regimen in hopes of getting plaintiff back to previous employment. Blood work and x-rays were then ordered. (Tr. 163).

On May 28, 2003, plaintiff's laboratory work was completely normal and her x-rays were stable. (Tr. 162). However, she continued to have significant lumbago. Accordingly, she was given a Depo-Medrol injection. (Tr. 162).

On May 28, 2003, Dr. D. Luke Knox indicate that recent x-rays showed that plaintiff's back was stable. (Tr. 198). However, an MRI of plaintiff's lumbar spine on July 2, 2003, showed epidural fibrosis on the right at L5-S1secondary to an old injury, degenerative disc disease, and degenerative end plate changes. (Tr. 199).

On July 13, 2003, plaintiff complained of continued right hip and buttock pain extending down to the knee. (Tr. 160). Dr. Knox noted that her MRI showed no evidence of recurrent disc herniation. Therefore, he suspected that her pain may be related to epidural fibrosis. To be on the safe side, he ordered a myelogram. (Tr. 160).

On July 14, 2003, plaintiff complained of lower back pain. (Tr. 116). She indicated that the pain radiated from her posterior thigh to her knee. (Tr. 116). Plaintiff also reported numbness and tingling in her great and first toes, as well as swelling in her right ankle. For this, she was given a prescription for Vicodin. Dr. Knox also ordered a myelogram of her lumbar spine. (Tr. 116).

On August 14, 2003, plaintiff saw Dr. J. Michael Standefer regarding her right hip and leg pain. (Tr. 243-244). He noted that she had a history that was consistent with a mild S1 radiculitis.

4

Dr. Standefer indicated that Dr. Knox had ordered a myelogram for the purposes of completeness but voiced his doubts that any surgical pathology would be identifiable. However, in view of the chronic nature of plaintiff's symptoms, Dr. Standefer indicated that he would concur with Dr. Knox's recommendation. Further, because plaintiff was on rather large doses of potent medication, he recommended that she wean off of this medication and utilize anti-inflammatory medication for long-term treatment purposes. Dr. Standefer was of the opinion that the utilization of Neurontin would be reasonable in this case. (Tr. 244).

On August 18, 2003, plaintiff underwent a myelogram and a post-myelogram computerized tomography ("CT") scan. (Tr. 114-115). Dr. David F. Rhodes noted that the myelogram study was normal. (Tr. 114). However, the CT scan revealed a right posterior inferior disc protrusion with a possible free fragment and right S1 nerve root compromise. (Tr. 115). Dr. Knox concluded that the free disc fragment was probably perineural scar tissue. (Tr. 158).

On September 4, 2003, Dr, Knox noted that plaintiff continued to be plagued with significant S1 radiculopathy. (Tr. 158). Although Dr. Rhoads' recent myelogram and post-myelogram CT scan reports showed a free disc fragment, Dr. Knox felt this was a probably perineural scar. He noted that surgical stabilization was an option, but indicated that he was not inclined to recommend it at that point. Instead, Dr. Knox referred plaintiff to Dr. R. David Cannon for selective nerve root block. (Tr. 158). In his referral to Dr. Cannon, Dr. Knox noted that plaintiff was taking "entirely too much Hydrocodone" and was starting to wean herself from it. (Tr. 159). Further, he indicated that he had begun plaintiff on Neurontin, which would be incrementally increased over the following several weeks. (Tr. 159).

On October 1, 2003, Dr. Standefer noted no evidence of any recurrent disc protrusion or any other surgical problem on plaintiff's myelogram, post myelogram CT scan, or MRI of the lumbar spine. (Tr. 247). He did, however, state that degenerative and postsurgical changes were evident at the L5-S1 level on the right side. Accordingly, Dr. Standefer concluded that continued conservative care appeared to be appropriate. (Tr. 247).

On October 14, 2003, Dr. Cannon indicated that plaintiff had been scheduled to undergo an S1 selective nerve root block in the very near future. (Tr. 157). Recent radiographs had shown disc degeneration with epidural fibrosis around the L5-S1 nerve roots. Dr. Cannon noted his understanding that, depending on the results of plaintiff's nerve root block, plaintiff could be scheduled to undergo possible lumbar fusion. (Tr. 157).

On October 17, 2003, Debbie Blaylock, plaintiff's case manager, wrote a letter to Dr. Knox indicating that plaintiff had described her pain as severe. (Tr. 155). Further, plaintiff allegedly told Ms. Blaylock that she had to obtain Hydrocodone from a friend. According to the letter, plaintiff reportedly stated that she had been taking two tablets every two hours, four tablets at bedtime, and four during the night. Ms. Blaylock also indicated that plaintiff had complained of "a lot of emotional problems in her personal life." (Tr. 155).

On November 20, 2003, Dr. Knox noted that, plaintiff was scheduled to undergo a selective nerve root block, but it was probably not a worthwhile option because her postoperative tests showed no evidence of compressive pathology. (Tr. 154). He recommended that she close out her workers compensation claim since she would qualify for a ten percent permanent partial disability to the body as a whole. (Tr. 154). Accordingly, Dr. Knox was of the opinion that plaintiff should undergo a

functional capacity evaluation in hopes of defining her level of function and possibly pursing vocational tech retraining. (Tr. 154).

On December 3, 2003, Doug Webb, a physical therapist, completed a functional capacity evaluation of plaintiff. (Tr. 204-236). Based on objective testing, he concluded that plaintiff could lift a maximum of ten pounds but could not lift any weight from the floor. (Tr. 234). Further, he found her able to carry small objects, occasionally walk and stand, and frequently sit. (Tr. 233, 234). Mr. Webb noted that plaintiff would experience severe difficulty performing competitive work beyond the sedentary physical demands level. (Tr. 233). Although he indicated that her physical effort during testing was variable, Mr. Webb did state that the results indicated that she gave good effort when encountering activities that did not require bending or prolonged standing. (Tr. 232). Further, he noted that plaintiff's subjective complaints matched up "fairly well" with her objective abilities. (Tr. 232). On December 15, 2003, Dr. Knox voices his agreement with the results of the functional capacity evaluation. (Tr. 153).

On December 28, 2003, plaintiff sought emergency treatment for lower back pain. (Tr. 174). She indicated that it radiated bilaterally down her legs and was associated with numbness in her hands. Plaintiff was diagnosed with lower back strain and released home with instructions to refrain from activities that aggravated her pain. (Tr. 176). The doctor also directed her to apply heat to the affected area. (Tr. 176).

On January 14, 2004, plaintiff again complained of lower back pain. (Tr. 170-172). The pain was reportedly exacerbated by movement and walking and relieved by remaining still. (Tr. 171). An examination was normal. Accordingly, plaintiff was diagnosed with lower back pain and advised to formalize outpatient treatment with her primary care doctor. (Tr. 172).

On February 11, 2004, Dr. Knox opined that he did not believe plaintiff would benefit form any further surgical endeavors. (Tr. 203). He indicated that she could go through with an L5-S1 fusion procedure and still not be any better. As such, Dr. Knox urged plaintiff to back off of her acetaminophen usage. He also urged her to avoid any further narcotic use. Dr. Knox then indicated that she should pursue vo-tech training to find employment that would be more agreeable to her lumbar complaints. (Tr. 203).

On February 12, 2004, plaintiff established care with Dr. David Clay. (Tr. 248-250). She complained of chronic back pain. Although a physical examination was normal, Dr. Clay refilled her prescription for Propoxyphene Acetaminophen. (Tr. 250).

On October 4, 2004, plaintiff's major complaint was of chronic back pain. (Tr. 256). Dr. Clay added Neurontin to her medication regiment. (Tr. 256).

**Applicable Law**:

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of

those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003), 416.920. Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schwieker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920 (2003).

9

**Discussion:**

Of particular concern to the undersigned is the ALJ's failure to properly consider plaintiff's non-exertional limitations. The ALJ reviewed the medical evidence of record but concluded that plaintiff could perform a full range of sedentary work. He then used the grids to conclude that plaintiff could perform work that existed in significant numbers in the national economy. However, in cases like this, where the claimant suffers from non-exertional impairments that diminish or significantly limit a claimant's RFC to perform a full range of Guideline-listed activities, the ALJ may not rely solely on the grids, but instead must obtain the opinion of a vocational expert. *See Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). Examples of non-exertional limitations include obesity, pain, depression, intolerance to dust or fumes, and difficulty performing manipulative or posterior functions such as reaching, handling, stooping, climbing, crouching, or crawling. 20 C.F.R. § 404.1569(c). The United States Court of Appeals for the Eighth Circuit has made the following ruling concerning pain:

> Pain may be a nonexertional factor to be considered in combination with exertional limitations as well as a separate and independent ground for disability. . . . Where pain is considered in combination with exertional limitations, however, it need only be found significant enough to prevent the claimant from engaging in the full range of jobs contemplated by the exertional category for which the claimant otherwise qualifies.

*McCoy v. Schweiker*, 683 F.2d 1138, 1148 (8th Cir. 1982) (en banc) (reversed on other grounds).

In the present case, the medical evidence is replete with reports of lower back, leg, and hip pain. Further, records indicate that, since her surgery, plaintiff has been prescribed a variety of medications to treat this pain, including Vicodin, Hydrocodone, Darvocet, Flexeril, Skelaxin, and Neurontin. A functional capacity evaluation even revealed that plaintiff's subjective complaints were fairly consistent with her objective abilities. Further, this evaluation indicated that, while

10

plaintiff could lift ten pounds occasionally, she could not lift something up off of the floor. Because the ALJ failed to properly consider this evidence, we believe that remand is necessary. *See Polaski*, 739 F.2d at 1322.

While we note that the record does contain evidence to indicate that plaintiff was taking large doses of strong medication and sometimes taking more medication than prescribed, the record does not make clear the cause of this behavior. Although the ALJ presumes that plaintiff's behavior weighed against her subjective complaints, given the record before us, we cannot say that substantial evidence supports that determination. Therefore, on remand, he is also directed to develop the record further regarding plaintiff's alleged misuse and over use of her prescription pain medications.

The ALJ also failed to develop the evidence as to the side effects of plaintiff's current medications. At the hearing, plaintiff testified that she was taking Neurontin and Darvocet. (Tr. 267). We note that Neurontin can cause drowsiness, dizziness, and weakness. *See* PHYSICIANS' DESK REFERENCE (PDR) 2501 (60th ed. 2006). Moreover, Darvocet is a narcotic analgesic drug that can cause dizziness and sedation. *See id*. at 3498. As these side effects were not properly considered, remand is necessary to allow for their proper consideration.

### III. Conclusion:

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and, therefore, recommend that the denial of benefits to plaintiff be reversed and this matter remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections**

**may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of June 2006.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE